No. 24876.

THE PEOPLE OF THE STATE OF COLORADO *v.* FRANCIS A. MOJO, JR., JOHN STORR, DAVID D. TOOLEY AND ELLSWORTH NICHOLS, JR.

(480 P.2d 571)

Decided February 1, 1971.

STANLEY F. JOHNSON, District Attorney, Twentieth Judicial District, ROBERT M. JENKINS, Chief Deputy, for plaintiff-appellee.

BLEWITT, BISBEE & GEIL, for defendants-appellants Francis A. Mojo, Jr. and John Storr.

WILLIAMS, TRINE and GREENSTEIN, WILLIAM D. NEIGHBORS, for defendant-appellant Ellsworth Nichols, Jr.

*En Banc.*

MR. JUSTICE LEE delivered the opinion of the Court.

THIS is an interlocutory appeal from an order denying three motions filed on behalf of defendants Nichols, Storr and Mojo to suppress evidence seized at the time of defendants' arrest. Appellants will be referred to as defendants or by name.

Defendants were charged in the District Court of Boulder County, along with Robert M. Duitsch and Roland J. Duitsch (who are not parties to this appeal), with two counts: possession of narcotic drugs for sale, C.R.S. 1963, 48-5-20, and conspiracy to commit the crime of selling narcotic drugs, C.R.S. 1963, 40-7-35.

The events leading to the arrest of defendants and the seizure of the marijuana took place during the late hours of November 13 and the early morning of November 14, 1969. Undercover officers, Investigator Taketa of the Adams County Sheriff's Department, working in conjunction with Officer Newman of the Boulder County Police Department, contacted Robert Duitsch and defendant Storr to negotiate the purchase of a large quantity of marijuana. The officers made a deal to purchase 100 kilos (220 pounds) of marijuana at a price of $5,600. They were instructed to call back at 11:45 that evening to receive instructions about the pickup point. At the appointed hour the officers made the call and were instructed that the transaction would take place at the Base Mar shopping center at approximately midnight. Officers Taketa and Newman and several other cover police officers went to the rendezvous at the appointed time. The cover officers were stationed in unmarked vehicles at various points throughout the shopping center parking lot for surveillance of the transaction. The only businesses open at that hour were a hamburger stand and a pancake house located at one end of the shopping center. There was very little vehicular traffic through the shopping center lot.

The first person to approach Officers Taketa and Newman was Duitsch. Shortly thereafter a jeep arrived with defendants Storr and Mojo. Mojo was introduced as the contact man for the marijuana suppliers. While conversation was conducted by these five persons, surveilling officers noticed a white Ford Econoline van enter the parking lot. The van was closely followed by a Ford Mustang. The van and Mustang stopped in the center of the parking lot. One of the surveilling officers noticed the taillights or brake lights of the jeep flash. At this point the van began moving again and was driven by and within about twenty feet of the officers transacting the drug sale. It then exited the parking lot. As the van was traveling toward the group transacting the

sale, defendant Mojo motioned toward the van and stated, "The van is not going to stop, but that is where the marijuana is." The Mustang proceeded directly to the group and stopped. There were no other vehicles moving within 100 yards of the undercover officers and defendants at that time.

Negotiations between Officer Taketa and Mojo came to a standoff. Taketa wanted to see the marijuana before he paid the money; and Mojo wanted the money before he turned over the marijuana. Taketa and Mojo then drove over to a parked camper truck which was occupied by two of the surveilling officers, Ruzicka and Diezi. There, Ruzicka gave Taketa a "flash" roll of $1,000 to show Mojo. Taketa advised Ruzicka what Mojo had said concerning the van containing marijuana. Mojo insisted on seeing the rest of the money and thereupon the deal was called off.

The testimony indicated that thereafter a white Ford Econoline van entered the parking lot. Officers Ruzicka and Diezi stopped the van at a point in front of the pancake house. The jeep containing defendants Mojo and Storr followed directly behind the van and was stopped. The Ford Mustang escaped the area. At this point all the unmarked and several marked police cars converged on the area. The occupants of the van, defendants Nichols and Tooley, were then arrested, as were defendants Mojo and Storr.

The contents of the van could not be seen from the outside. Police officers opened the doors to inspect the interior and found a large number of brown paper bags. They noticed a strong odor of marijuana and upon opening one of the bags found it to contain the suspected marijuana.

The defendants sought to suppress the bags of marijuana from evidence. The trial court denied defendants' motion. We affirm this ruling.

The motions to suppress were substantially identical and alleged as grounds that the evidence was obtained

without a valid search warrant and pursuant to an illegal arrest in violation of the constitutional rights of the defendants. The trial court found that from the totality of the circumstances probable cause existed to justify the actions taken by the police.

As we view the sequential development of the events of the evening, no other rational conclusion could be reached than that the various defendants were engaged in a criminal conspiracy to sell narcotics. A review of their actions indicates that they agreed, conspired, planned and cooperated in an effort to unlawfully sell marijuana. The following events bear this out. Duitsch and defendant Storr initially negotiated with the undercover officers for the sale of a specific substantial quantity of marijuana at a certain price. The officers were informed that the marijuana was being brought down from the mountains and that they should call back at a certain time for instructions. Upon calling back they were directed to meet at the Base Mar shopping center at midnight to consummate the deal. Upon arrival at the shopping center, they were met by Duitsch and defendants Storr and Mojo. Mojo then took over, attempting to finalize the negotiations. The white Ford van occupied by Nichols and Tooley approached the meeting place and Mojo stated that the marijuana was in the van. The jeep lights blinked, apparently signaling the van which then proceeded out of the parking area. Mojo demanded to see the money and was shown a thousand dollars. Shortly thereafter the van returned to the shopping center.

At this point, from the foregoing events, all of which were in the officers' knowledge, it would be difficult for a person of reasonable caution to believe otherwise than that a criminal offense was being committed, for which an arrest could legally be made without the necessity of first obtaining a warrant. C.R.S. 1963, 39-2-20; *Lavato v. People*, 159 Colo. 223, 411 P.2d 328; *Gonzales v. People*, 156 Colo. 252, 398 P.2d 236.

We hold that probable cause existed for the war-

rantless arrest of defendants that followed. The arrest being legal, the immediate search of the Ford van for contraband and seizure of the marijuana — the means by which the crime was being committed — was also lawful. *Hernandez v. People,* 153 Colo. 316, 385 P.2d 996.

■ In the recent case of *People v. Clark,* 173 Colo. 129, 476 P.2d 564, it was suggested that the circumstances justifying the arrest may also be those that furnish probable cause for a warrantless search. We believe that statement to be applicable here. Viewed from the standpoint of the warrantless search alone, without regard to the arrest, probable cause to believe the van contained contraband existed which would justify the search and seizure which followed. *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419.

*Chambers, supra,* answers the argument that having stopped the van and arrested the defendants, it was then incumbent on the officers to obtain a warrant to search the van and open the bags in which the marijuana was found.

"Arguably, because of the preference for a magistrate's judgment, only the immobilization of the car should be permitted until a search warrant is obtained; arguably, only the 'lesser' intrusion is permissible until the magistrate authorizes the 'greater.' But which is the 'greater' and which the 'lesser' intrusion is itself a debatable question and the answer may depend on a variety of circumstances. For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment." *Chambers, supra.*

An immediate search of the vehicle, as was here conducted, was constitutionally permissible.

It was further argued that the instant case is controlled by *Chimel v. California,* 395 U.S. 752, 89 S.Ct.

2034, 23 L.Ed.2d 685. We do not view the principles set forth in *Chimel* as applicable to the situation before the Court.

The ruling is affirmed.